Filed 9/19/23  In re J.M. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | D081937 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent<br><br>    v.<br><br>L.M. et al.,<br><br>    Defendants and Appellants, | (Super. Ct. No. J521007) |

APPEALS from orders of the Superior Court of San Diego County, Marissa A. Bejarano, Judge.  Affirmed in part; dismissed in part.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant, L.M.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant, C.M.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

The San Diego County Health and Human Services Agency (Agency) filed a dependency petition under Welfare and Institutions Code[1] section 300, subdivision (c) on behalf of then 10-year-old J.M. based on J.M.'s aggressive behavior and the parents' unwillingness to provide mental health treatment. Although court-appointed counsel represented Mother, she filed numerous motions in propria persona. In March 2023, Mother filed a request asking to represent herself. At a hearing on April 11, 2023, the juvenile court found J.M.'s proceedings would be significantly delayed if it granted Mother's request for self-representation. Mother appeals from this order and C.M. (Father) joins her arguments.[2] We affirm.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Mother filed three notices of appeal. The first, filed in propria persona, is from the March 16, 2023, order and several other orders made by the juvenile court. The second, filed by Mother's trial counsel, challenged the order denying Mother's request for self-representation and several other orders. Mother filed a third notice of appeal, in propria persona, also challenging the order denying her request for self-representation. Mother's opening brief is limited to the order denying her request for self-representation. Accordingly, we treat the appeal from the other orders listed in her notices of appeal as forfeited and do not consider them. (*In re Adrian L.* (2022) 86 Cal.App.5th 342, 344, fn. 1 [although notice of appeal included appeal from order denying section 388 petition, parent forfeited any claim of error where opening brief presented no argument on that issue].)

Father filed an opening brief joining Mother's arguments. The Agency submits we lack jurisdiction to consider Father's appeal because he did not include the April 11, 2023, hearing or the juvenile court's order denying Mother's request for self-representation in his notice of appeal. While we must liberally construe a notice of appeal (*In re J.F.* (2019) 39 Cal.App.5th 70, 75; Cal. Rules of Court, rule 8.405(a)(3), this policy does not apply where the notice of appeal " 'is so specific it cannot be read as reaching a judgment or order not mentioned at all.' " (*In re J.F.*, at p. 76.) Here, Father's notice of appeal does not mention the April 11, 2023, hearing or the juvenile court's order denying Mother's request for self-representation. We cannot liberally

FACTUAL AND PROCEDURAL BACKGROUND[3]

On March 28, 2022,[4] Father called the police after J.M. assaulted him and Mother in the family vehicle. J.M. was hospitalized on a section 5150 hold. After J.M.'s hospitalization, the Agency detained J.M. in a foster home because J.M. did not wish to have contact with either parent. On April 12, the Agency filed the petition on J.M.'s behalf and the detention hearing took place on April 13 and 14. On April 13, the juvenile court appointed counsel for the parents and J.M., took temporary emergency jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) and continued the matter for one day.

The following day, Mother expressed her belief that Missouri was J.M.'s home state under the UCCJEA and both parents claimed Native American ancestry. The court continued emergency jurisdiction under the UCCJEA and endorsed a request by the Agency that the parents provide the Agency with information for relatives who may have information about their Native American heritage. It also ordered the parents to create a timeline from and after the time Missouri issued custody orders until the filing of J.M.'s petition. The court suspended visits between J.M. and the parents, ordered voluntary services for the parents, found J.M.'s petition met prima facie requirements, and ordered J.M. detained from parental custody.

---

construe Father's notice to apply to a different, omitted order. (*Ibid.*) Accordingly, we dismiss Father's appeal.

[3]    Because our discussion addresses Mother's conduct during this dependency proceeding, in the interest of brevity, we omit mention of her conduct here and instead provide an outline of the proceedings leading to Mother's request for self-representation.

[4]    Undesignated date references are to 2022.

At the May 5 jurisdiction/disposition hearing, Mother claimed her father lived on a reservation in Watersmeet, Michigan and she was registered with the Chippewa and Choctaw tribes. The juvenile court again ordered the parents to provide a timeline addressing where the family lived during the six months preceding the dependency action. At the continued jurisdiction/disposition hearing on May 23, Mother was not present. The Agency indicated it never received a timeline from the parents with Mother's counsel representing that Mother had provided the information to the Agency on "numerous occasions." Based on its inquiry with two other states, the juvenile court determined California was J.M.'s home state and retained exclusive jurisdiction over the matter.

At the contested jurisdiction/disposition hearing on October 21, the juvenile court declared J.M. a dependent and scheduled a disposition hearing. At the contested disposition hearing on November 10, the court confirmed its receipt of Mother's five motions and a motion from Mother's counsel to appoint new counsel. The court conducted a hearing under *People v. Marsden* (1970) 2 Cal.3d 118, granted Mother's motion to withdraw her counsel, and continued the hearing to appoint new counsel. The juvenile court appointed Mother new counsel at a special hearing on November 16.

At a pretrial status conference in early February 2023, Mother's new counsel asked to set aside the court's true finding due to inadequate representation by Mother's former counsel. She set several dispositional issues for trial, and asked the court to remove social worker Miller from the case. At a pretrial status conference in late February 2023, the juvenile court denied Mother's requests to set aside the true finding and to remove Miller from the case.

At the March 16, 2023, contested disposition hearing, the juvenile court removed J.M. from parental custody, ordered that J.M. be placed in a short-term residential therapeutic program or foster home, found the Indian Child Welfare Act (ICWA) did not apply without prejudice, and ordered reunification services for the parents. On March 27, 2023, Mother filed a request that the juvenile court relieve her appointed counsel and allow her to represent herself. On April 11, 2023, the court denied Mother's request for self-representation finding while Mother was not disruptive, granting her request would cause significant delays. The court noted Mother "has not complied with all of the court's orders since the outset of this case" and "repeatedly attempted to file her own motions with this court, which this court has then provided and turned over to counsel in order to allow counsel to determine how to legally proceed in this case and in order to prevent further delays."

## DISCUSSION

Mother contends the juvenile court erred when it denied her request for self-representation, arguing her motions caused no delay, she displayed the ability to understand the proceedings, and her failure to follow court orders related to the ICWA and the UCCJEA were not solely her fault and did not impact the proceedings. She claims the juvenile court erroneously relied on *In re A.M.* (2008) 164 Cal.App.4th 914 and that the matter is more analogous to *In re Angel W.* (2001) 93 Cal.App.4th 1074 (*Angel W.*). As we will explain, substantial evidence supports the court's findings, which in turn fully justifies the refusal to permit Mother to represent herself.

While there is no constitutional right to self-representation in dependency proceedings, a parent has a statutory right to self-representation

5

under section 317.[5]  (*Angel W., supra*, 93 Cal.App.4th at pp. 1082–1084.)  A parent's right to self-representation, however, must be balanced against the rights of other parties, such as the child's right to prompt resolution of his or her custody status.  (*In re A.M., supra*, 164 Cal.App.4th at p. 925.)  "[T]he juvenile court has discretion to deny the request for self-representation when it is reasonably probable that granting the request would impair the child's right to a prompt resolution of custody status or unduly disrupt the proceedings.  A parent's disruptive behavior may be sufficient to deny a request for self-representation, but it is not necessary.  If it is reasonably probable that granting a parent's request for self-representation will lead to undue delay in the proceedings that would impair the child's right to a prompt resolution of custody, the juvenile court has discretion to deny the request regardless whether the parent has ever behaved disruptively."  (*Id.* at pp. 925–926.)

As a preliminary matter, we reject Mother's argument that this matter is analogous to *Angel W., supra*, 93 Cal.App.4th 1074.  In *Angel W.* the juvenile court denied the parent's request to represent herself, citing concerns the parent might disrupt the courtroom proceedings.  (*Id.* at p. 1084.)  The appellate court acknowledged the validity of this concern but cautioned that "[t]he possibility of disruption or delay . . . exists to some degree with virtually all pro se litigants and the mere possibility alone is not a sufficient ground to deny self-representation."  (*Id.* at p. 1085.)  In *In re A.M.*, the reviewing court was not confronted with a disruptive parent but with a parent who had sought multiple continuances of a contested

---

[5]  Section 317, subdivision (b) requires appointment of counsel for an indigent parent or guardian in a juvenile dependency case "unless the court finds that the parent or guardian has made a knowing and intelligent waiver of counsel as provided in this section."

6

jurisdiction/disposition hearing when he first sought to represent himself. (*In re A.M.*, *supra*, 164 Cal.App.4th at p. 920.) As the *In re A.M.* court explained, *Angel W.* considered the scope of a juvenile court's discretion to deny a parent's request for self-representation only in the context of a potentially disruptive parent. (*In re A.M.*, at p. 924.)

Unlike the parent in *Angel W.*, *supra*, 93 Cal.App.4th 1074, the juvenile court found Mother did not disrupt the proceedings. Accordingly, Mother's reliance on *Angel W.* is misplaced. Rather, the juvenile court anticipated that granting Mother's request for self-representation would cause significant delays. Substantial evidence supports this conclusion.

Mother filed her request for self-representation on March 27, 2023, nearly one year after initiation of the dependency proceedings. At that time, the 12-month review hearing was not scheduled until September 11, 2023, over seven months later. As the juvenile court impliedly recognized, even with counsel, Mother's general behavior caused part of the delay in these proceedings. As we will detail, Mother's conduct throughout the proceedings revealed she was not equipped to represent herself and allowing her to do so would likely result in undue delay in the proceedings.

First, Mother failed to comply with the court's orders related to resolving ICWA and UCCJEA issues. At the outset of this proceeding Mother claimed the State of Missouri had granted her custody of J.M., creating an issue whether the State of California had jurisdiction. Thus, at the April 14 continued detention hearing, the court maintained emergency predicate jurisdiction and ordered the parents to create a timeline from and after the time Missouri issued custody orders until the filing of J.M.'s petition. The parents failed to do so which required the court at the May 5 jurisdiction/disposition hearing to again ask them to provide a timeline

7

addressing where the family lived during the six months preceding the dependency action. This lack of information required the court to continue the hearing for UCCJEA and case plan purposes.

At the continued jurisdiction/disposition hearing on May 23, Mother did not appear. Mother's counsel expressed concern about proceeding "without the Court first providing us with the fact that we are able to actually proceed pursuant to the UCCJEA." The court noted on the record its communications with judicial officers in other jurisdictions and expressed the belief it had jurisdiction. When counsel for the Agency reminded the court that it had twice ordered the parents to provide information about where the family resided during the six months preceding the filing of J.M.'s petition, Mother's counsel replied, "According to the mother, she's provided that to the Agency on numerous occasions." The court stated it had reviewed all the emails Mother sent to the Agency and it did not locate an outline of where Mother had resided for the last six months. Two social workers informed counsel for the Agency that Mother never provided this information. After Father provided an address where J.M. had been living in Missouri before the dependency proceeding, the court made a finding that it had jurisdiction over the matter because it had already contacted a judicial officer from that location who denied jurisdiction over the child. Mother's failure to comply with the court's order to provide a timeline resulted in a one month delay in resolving this jurisdictional issue.

The court encountered similar problems obtaining information from Mother regarding the ICWA. At the April 14 continued detention hearing Mother claimed Choctaw and Chippewa ancestry and the court ordered her to fill out the appropriate ICWA documents. At the May 5 hearing, Mother claimed she was registered with the Chippewa and Choctaw tribes and her

8

father lived on a reservation in Watersmeet, Michigan and was on "the high council." When the court attempted to conduct ICWA inquiry with her, Mother was nonresponsive and complained about "20 different people e-mailing me asking me for the same information over and over again." The court ordered Mother to complete the ICWA-030 form. When the court asked Mother to stop interrupting, she hung up.

At the May 23 hearing, the Agency represented it was working on converting the ICWA-030 form into plain text for Mother based on her visual impairment. At the July 18 hearing, Mother's counsel stated Mother had not yet received the ICWA-030 form in an accessible format and Mother could not fill out the form until that occurred. Counsel for the Agency replied that Mother was provided the ICWA-030 form in plain text format and informed her counsel that if further accommodation was necessary the Agency could review the form over the phone with Mother but Mother refused to speak to the social worker. When the court questioned whether plain text format comported with the ADA, counsel for the Agency represented it did and noted "Mother receives emails in plain texts, including reports, and she responds to every email very quickly."[6] The court again ordered Mother to complete the ICWA-030 form and stated an Agency social worker was available to assist her. As of the writing of the July 18 addendum report, Mother had still not completed the ICWA-030 form. At the July 18, pretrial status conference the court ordered the parents' counsel to assist with the ICWA inquiry and

---

[6]    Mother's ability to read documents in plain text format is documented in the record. For example, the social worker sent Mother responses received from the tribes in plain text format via email with Mother responding eight minutes later claiming, among other things, her identity had been changed in federal court, her registration with her tribe was sealed by the court, and her father was on the tribal high council but failing to provide his name or how to reach him.

complete the ICWA-030 form. There is no ICWA-030 form in the record, suggesting even Mother's counsel had no success in resolving this outstanding issue. Ultimately, the Agency received responses from 15 Cherokee, Choctaw or Chippewa tribes denying any tribal affiliation. At the March 16, 2023, hearing the court found without prejudice the ICWA did not apply.

Mother's unwillingness to comply with court orders was not isolated to issues pertaining to the ICWA and the UCCJEA. On November 16, the juvenile court denied the parents' request for unsupervised contact. Although Mother did not appear for this hearing, she was aware of the denial because she filed a pro per motion the following day attempting to appeal it. At a hearing on February 7, 2023, the juvenile court reminded Mother not to discuss the case or expansion of visitation with J.M. during their supervised visits because this caused behavioral issues and setbacks for J.M. However, in an email sent to the social worker, her counsel, and others the following week, Mother falsely told J.M. the court had ordered overnight and 60 day visits as part of the reunification plan.

In addition to failing to comply with court orders, Mother proved to be an inaccurate historian. At the outset of the proceeding, a physician informed the Agency that Mother initially stated J.M. was born in Missouri but then said she moved back to California just before J.M. was born. Later in the proceeding, Mother informed J.M.'s case manager that J.M. had cardiac issues but the Agency previously had J.M. undergo two cardiology evaluations which ruled out any cardiac issues. Mother also reported that J.M. previously used insulin which J.M. denied. The social worker expressed concern that the parents have refused to provide J.M.'s full medical history or provide signed releases to ensure J.M.'s medical needs were met.

Mother also consistently exhibited difficulty working with the Agency and the court. At the continued detention hearing on April 14, Mother appeared telephonically. Toward the end of the hearing, the juvenile court allowed her to make a brief statement. Mother did so, claiming the Agency was using the dependency proceeding "as a means of retaliation for a civil rights complaint and federal lawsuits that I have pending against the County." She claimed discrimination, she was a professional social worker who did not need parenting classes, and had no history of violence or mental illness. When the court interrupted Mother, she responded, "You are preventing me from speaking. I feel like you are preventing me from having due process. I have nothing else to say. You interrupted me. I would like to finish my statement, but if you will not allow it, that's fine. I will have judicial review in U.S. District Court." Mother then hung up.

From April 15 to May 5, Mother sent "at least" 50 emails, totaling approximately 200 pages, to social worker Miller. Among other things, her emails accused the Agency of removing J.M. under false pretenses, expressed her belief the Agency violated her rights, and informing Miller she had lawsuits pending against the Agency. For example, on April 22 Miller sent the parents an email requesting basic information, such as their current address, prior addresses, extended family information, whether they suffered from any disabilities, where they would like J.M. placed, and their willingness to participate in services. Mother responded about 90 minutes later, claiming she was advised by her federal attorney " 'not to answer most of those questions as they are an invasion of my privacy and the charges against me or unfounded I believe that the child protective services procedures are being used to conduct an investigation that San Diego

[H]ealth and [H]uman [S]ervices would not otherwise be able to complete because I have a pending federal lawsuit against your agency.' "

On May 12, Mother participated in a child and family team (CFT) meeting telephonically. She initially participated, but then expressed frustration and disconnected stating the meeting was taking too long and her phone was about to die. When the social worker asked Mother to participate in a subsequent meeting, she responded via email with anger and accusations. She declined to participate in another CFT meeting, stating, "I will not be participating in any more meetings with you I made that clear on [*sic*] the letter to you and your supervisor yesterday no more verbal communication in any form for any reason outside of court which is documented by a court reporter."

Finally, Mother filed numerous motions or ex parte requests in pro per despite being represented by counsel. On June 6, Mother filed a motion claiming violation of the UCCJEA and asking the court "to reverse its rulings on this matter and to reverse the change in custody jurisdiction and return her child immediately." On November 9, Mother filed two motions in pro per "for injunction to stop Lynette Miller and San Diego Health & Human Services from imposing stipulations outside of the court order or using the child visitation to barter and force services on parents" and for appointment of new counsel and to appeal the court's findings made on October 21. On November 10, Mother filed another motion in pro per for appointment of new counsel and to appeal the court's findings made on October 21. Mother, either alone or with Father, then filed an additional 14 motions or ex parte requests from November 2022 to March 2023.

Before denying Mother's request for self-representation the court explained it turned over the motions Mother filed in pro per to Mother's

counsel to determine how to legally proceed and prevent further delays. Our review of these motions and Mother's emails showed long and rambling communications addressing tangential issues or issues with institutions and agencies unrelated to the case. "A parent's past conduct is a good predictor of future behavior." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) Here, the juvenile court could have reasonably concluded Mother would continue to file motions and ex parte requests that lacked focused and cogent arguments and the absence of counsel to review future filings would result in delays while the court reviewed them. The court could have also reasonably concluded Mother's general inability to work with the Agency would be amplified if Mother represented herself and lead to significant delays in resolving the dependency proceeding. Because the record contains substantial evidence that, to a reasonable probability, granting Mother's request for self-representation would impair J.M.'s right to a prompt resolution of custody status, we cannot conclude the juvenile court abused its discretion when it denied Mother's request. (*In re A.M.*, *supra*, 164 Cal.App.4th at pp. 925–926.)

DISPOSITION

The April 11, 2023, order denying Mother's request to represent herself is affirmed.  Father's appeal is dismissed.

CASTILLO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

RUBIN, J.